IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

KIPP DAVIS,                          )
                                     )
                Plaintiff,           )
                                     )
        v.                           )    Case No.
                                     )    04-3545-CV-S-REL-SSA
JO ANNE BARNHART, Commissioner       )
of Social Security,                  )
                                     )
                Defendant.           )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

        Plaintiff Kipp Davis seeks review of the final decision of the Commissioner

of Social Security denying plaintiff's application for disability benefits under Titles

II and XVI of the Social Security Act ("the Act").  Plaintiff argues that (1) the ALJ

failed to consider plaintiff's obesity, (2) the ALJ improperly discredited the opinion

of plaintiff's treating podiatrist, Dr. Geoffrey Bricker, (3) the ALJ failed to consider

evidence of pain, and alternately, (4) there is new and material evidence

justifying a remand.  I find that the ALJ's finding that plaintiff can perform other

work in the economy is supported by substantial evidence and remanding for

further consideration of Dr. Apostol's opinion is not warranted.  Therefore,

plaintiff's motion for summary judgment will be denied, his alternate motion for

remand will be denied, and the decision of the Commissioner will be affirmed.

## I.    BACKGROUND

        On November 5, 2002, plaintiff applied for a period of disability and

disability insurance benefits alleging that he had been disabled since March 15,

2002.  Plaintiff's disability stems from numbness in his feet, heart disease, chronic obstructive pulmonary disease, diabetes, hypertension, lumbar spine degenerative disc disease, and degenerative spondylosis disease.  Plaintiff's application was denied on March 11, 2003.  On May 5, 2004, a hearing was held before an Administrative Law Judge.  On July 26, 2004, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On October 23, 2004, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a

2

balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d

1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange

Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948

F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence

standard presupposes a zone of choice within which the decision makers can go

either way, without interference by the courts. "[A]n administrative decision is not

subject to reversal merely because substantial evidence would have supported

an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir.

1988).

### III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is

unable to return to past relevant work by reason of a medically-determinable

physical or mental impairment which has lasted or can be expected to last for a

continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If

the plaintiff establishes that he is unable to return to past relevant work because

of the disability, the burden of persuasion shifts to the Commissioner to establish

that there is some other type of substantial gainful activity in the national

economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

4

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Michael Lala, in addition to documentary evidence admitted at the hearing and medical evidence submitted after the hearing.

### A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1975 through 2004:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1975 | $ 4,726.71 | 1990 | $    0.00 |
| 1976 | 512.73 | 1991 | 0.00 |
| 1977 | 570.00 | 1992 | 102.00 |
| 1978 | 72.50 | 1993 | 42.50 |
| 1979 | 2,240.01 | 1994 | 0.00 |
| 1980 | 4,058.41 | 1995 | 2,744.41 |
| 1981 | 3,138.20 | 1996 | 3,689.95 |
| 1982 | 1,043.27 | 1997 | 9,724.57 |
| 1983 | 174.20 | 1998 | 1,009.88 |
| 1984 | 0.00 | 1999 | 416.96 |
| 1985 | 0.00 | 2000 | 5,073.24 |
| 1986 | 92.96 | 2001 | 7,105.52 |
| 1987 | 0.00 | 2002 | 7,015.63 |

Case 6:04-cv-03545-REL   Document 17   Filed 10/26/05   Page 5 of 50

| 1988 | 0.00 | 2003 | 0.00 |
| 1989 | 0.00 | 2004 | 0.00 |

(Tr. at 95).

**Disability Report - Field Office**

On December 18, 2002, Mayela Hilton of Disability Determinations had a face-to-face meeting with plaintiff (Tr. at 96-100). She observed that plaintiff had no difficulty hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using his hands, or writing (Tr. at 99).

**Claimant Questionnaire**

On December 27, 2002, plaintiff completed a claimant questionnaire (Tr. at 119-122). In the questionnaire, he stated that he no longer wears boots or shoes with laces, he does not wear shirts that need to be buttoned, and he only shaves once a week, all of this due to his impairments (Tr. at 120). He used to cook, but now his wife does (Tr. at 120). Plaintiff sits in the living room and folds clothes, and puts the dishes up (Tr. at 120). Plaintiff puts together model cars and boats, but he has trouble concentrating due to his pain (Tr. at 121). Plaintiff's wife now does all the driving because he cannot feel the pedals with his feet and he is on a lot of medication that makes it unsafe to drive (Tr. at 121). Plaintiff goes out once or twice a week, and his wife drives him (Tr. at 121). He

normally goes to have coffee with his wife and friends for one to two hours at a time usually in the middle of the day (Tr. at 121, 122).

**B.       SUMMARY OF MEDICAL RECORDS**

The first record in the file is dated March 19, 2002, four days after plaintiff's alleged onset date.

On March 19, 2002, Ian McLean, D.C., a chiropractor, performed a lumbopelvic spine AP lateral view of plaintiff (Tr. at 153).  He found lumbar spine degenerative disc disease principally at L3, L4 and L5; posterior joint arthrosis L3 through S1, and degenerative spondylosis involving the imaged lower thoracic spine principally at T10-T11.

On October 29, 2002, plaintiff was admitted to Cox North and was discharged on November 1, 2002 (Tr. at 156-165).  Louis Krenn, M.D., diagnosed pancreatitis, insulin-dependent diabetes mellitus, hypertension, hypercholesterolemia, and renal insufficiency.  Plaintiff had come to the emergency room complaining of mid-epigastric abdominal pain.  He said nothing seemed to make the pain better and eating or drinking made the pain worse.  Plaintiff was working as a cook at Waffle House and was smoking less than one pack of cigarettes per day, down from four packs per day for the past 25 years.  "He does report blurring vision over the past several months.  He states that he has had his glasses subscription updated on more than one occasion over that time period."

7

Plaintiff's blood sugar was 477 on admission and he was started on a low-dose sliding scale insulin. "He also had a repeat lipid panel[1] obtained which showed an LDL of 15, total cholesterol of 212, HDL of 20 and triglycerides of 1,988. The patient was continued on his Tricor which he had been taking since diagnosis of hypertriglyceridemia[2]. Over the course of his admission, the patient's pain did begin to subside. He was eventually restarted on oral liquids and oral pain medication which controlled his pain well. His diet was slowly advanced as his pain continued to subside. Prior to discharge, he was on a regular diabetic diet as discussed by the nutritionist and was tolerating this well without any pain, nausea or vomiting. . . .

"During the course of this admission, the patient was noted to have an elevated BUN and creatinine. Initially it was felt that he might be suffering from some acute renal insufficiency. However, after aggressive fluid rehydration, his BUN and creatinine did remain elevated and it was further thought that he may be suffering from some chronic renal insufficiency. A renal ultrasound was obtained. . . . A pancreatic ultrasound was done, however, his pancreas was not adequately visualized due to his size. . . . . On the day of discharge of November 1, 2002, the patient was tolerating a diabetic diet without concerns of pain or nausea or vomiting. His blood sugars were under good control. . . . His blood

[1]Total cholesterol should be 200 or below, HDL should be 40 or above, and triglycerides should be below 150.

[2]Elevated triglyceride concentration in the blood.

8

pressure was under control and he had no other concerns, therefore, it was decided that he was stable for discharge." While in the hospital, plaintiff had a renal ultrasound which showed a simple cyst on his left kidney, but no other problems.

Plaintiff's condition on discharge was good. He was given instructions on a diabetic diet and was instructed to check his blood sugars at least twice a day.

On November 5, 2002, four days after he was discharged from the hospital, plaintiff filed his application for disability benefits.

On January 11, 2003, plaintiff went to the urgent care center and saw Nathan Kester, M.D. (Tr. at 173-176). Plaintiff complained of constant lower back pain, numbness in the toes on his right foot, numbness down his right leg from the knee, and numbness in his left foot. The records indicate that plaintiff reported smoking five packs of cigarettes per day for 35 years. Dr. Kester took an x-ray of plaintiff's lumbar spine. His impression was:

1.      No acute lumbar sine fracture of subluxation seen.

2.      Degenerative disc disease, L3-4, L4-5, and L5-S1.

3.      Diffuse lumbar facet joint arthrosis.

On February 26, 2003, plaintiff saw Chi-Hsi Lin, M.D., a neurologist, at the request of Disability Determinations. Portions of Dr. Lin's report are as follows:

[T]he chief complaints [are] that he had four herniated ruptured discs with low back pain all the time for the last four or five years with pain radiating down to right lower extremities including right foot and numbness in the right lateral leg and all toes of the right foot. He complains of numbness in

9

all toes of left foot which started about three months ago. In addition he complains of having pain in left scapular area where he feels burning like sunburn started about eight or nine months ago occurring all the time. Also numbness from mid upper arm down to the right hand for the last two years which come and go without previous injury. . . . He says . . . [on] March 17, 2002,. . . [he] went to see chiropractor in Davenport, Iowa where he had x-ray taken in his back at the Palmer chiropractic clinic on March 19, 2002, that showed degenerative disc disease, spondylosis, osteoarthritis, and herniated discs. He has had no MRI or CT scan of lumbosacral spine nor has he had any myelogram, EMG and NCV etc. He says walking around seems to help pain in his back and right leg however prolonged sitting, standing too long in one position or even lying down would exacerbate the pain. He says. . . bending over . . . aggravates his pain in the back.

PAST MEDICAL HISTORY
. . . He was found to have diabetes mellitus while in the local hospital in October 2002 and also history of hypertension for the last five or six years. He had two heart attacks, one in 1996 had another one in 1997 and was at the Genesis Medical Center in Davenport, Iowa. In 1997 he had coronary stenting implanted followed by coronary angiogram in 1998 and 1999 respectively. . . . He was told he had TIAs[3] or mini stroke in 1996 that he says right side of the body quit working with no hand grip and dragging right foot for about one week. . . . Says he had pancreatitis[4] in March or April and October 2002. . . .

SOCIAL HISTORY
He smokes 10 cigarettes a day for the last five months, prior to that five packs of cigarettes a day for 25 years. He does not drink or use illicit drugs.

REVIEW OF SYMPTOMS
. . . [D]enies dizziness, blurred vision, diplopia [double vision], or speech difficulty. . . . [C]omplains of muscle spasm mostly in the right leg and left side of neck in the last two years.

---

[3]Transient Ischemic Attack, a temporary blockage of the blood supply to the brain caused by a blood clot and usually lasting ten minutes or less, during which dizziness, blurring of vision, numbness on one side of the body, and other symptoms of a stroke may occur. Also called ministroke.

[4]Inflammation of the pancreas.

PHYSICAL EXAMINATIONS
Blood pressure 127/80. . . . He weighs 225 lbs. with height 5 ft. 11 1/2 inches without shoes. . . .
Back:  There is no paraspinal muscle spasm and mild tenderness in the lumbosacral spine when asked about.  I do no feel there is true tenderness there.
ROM [range of motion] of lumbar spine:  A. Flexion-Extension (0-90) 90 degree.  B. Lateral Flexion (0-25) Right 25 degree, Left 25 degree.

NEUROLOGIC EXAMINATIONS
. . . Motor systems show normal muscle bulks and tones with strength 5/5 in both upper and lower extremities. . . . Sensory examination reveals questionable decrease pinprick in the right leg including right foot compared to the left leg.  Vibration and position senses in both upper and lower extremities are well preserved.  (Initially when testing position senses in both big toes, he cannot tell where I move his big toes up or down, namely he has "loss of position senses" in both big toes.  I tell him this creates discrepancy in relation to his other neurological findings and complaints.  He then asks me to try test again, this time he is able to tell me where I move his big toes up or down without difficulty at all). . . . Gait is without wide base and normal.  He can do tandem walking and he can walk with tiptoes and heels.  He can squat down and up without difficulty. Straight leg raising tests are negative bilaterally either in the sitting or supine position.

SUMMARY:
I find no abnormal neurological findings to suggest any root compression syndrome secondary to disc herniation etc.  By x-ray, he has degenerative disc disease, L3-4, L4-5, and L5-S1 and also diffuse lumbar facet joints arthrosis.  He has normal gait and does not require assistive devices. There is no impairment of sitting, standing, walking, hearing, speaking and traveling despite any observed functional limitations.  He is able to do lifting, carrying, and handling objects.

(Tr. at 178-180).

On March 11, 2003, plaintiff's application for disability benefits was

denied.

On March 28, 2003, plaintiff saw Dr. Krenn for complaints of arm and toe numbness (Tr. at 244-247). Plaintiff also noted that he had some occasional chest pain for which he takes nitroglycerin and that relieves the pain. He has coronary artery disease and was status post stent placement, "no radiation of pain, no associated symptoms." Plaintiff denied visual changes. He was smoking less than one pack of cigarettes per day, and reported that he was walking for exercise. He weighed 265.6 pounds. On exam, plaintiff was unable to actively move his toes, he had limited range of motion in his right ankle but full passive range of motion. He had full active and passive range of motion in his left foot. Plaintiff had full range of motion in his back but pain with active range of motion. Dr. Krenn diagnosed coronary artery disease; degenerative disc disease; peripheral neuropathy[5]; chronic obstructive pulmonary disease, stable; hypertension, unchanged; hyperlipidemia, unchanged; diabetes controlled, unchanged; and chronic renal insufficiency, unchanged. He noted that plaintiff's diabetes and hypertension were well controlled. He recommended an MRI of the cervical and lumbar spine for further diagnosis of the degenerative disc disease and peripheral neuropathy. Finally, Dr. Krenn counseled plaintiff regarding smoking cessation.

---

[5]Peripheral neuropathy describes damage to the peripheral nervous system, which transmits information from the brain and spinal cord to every other part of the body.

On April 3, 2003, plaintiff saw Nilesh Patel, M.D. (Tr. at 185-187). Plaintiff complained of left kidney pain, rated a 6 out of 10 in severity. Plaintiff reported that his blood sugar was "fairly well controlled". Plaintiff reported a long history of smoking about five packs of cigarettes per day, had cut down to about 17 cigarettes per day. He was experiencing no shortness of breath and no chest pain. Plan: "[W]ill check ultrasound of the kidney. Urinalysis. Additionally I am going to check a MRI of the renal arteries. . . . I suspect most likely etiology is not diabetic because he has only had that for about 1 1/2 years. I suspect the most likely etiology of his renal insufficiency is nephrosclerosis. He does have arteriosclerosis as evidenced by coronary artery disease and a history of smoking 5 packs per day."

On April 8, 2003, plaintiff saw Joseph Apostol, M.D., a cardiologist (Tr. at 253-255). Plaintiff's weight was 263 pounds. Dr. Apostol noted that plaintiff had had a lipid profile done on March 28, 2003 which showed total cholesterol 211 [normal is below 200], HDL 25 [normal is 40 or above], and triglycerides 798 [normal is below 150]. Plaintiff had reduced his smoking from five packs of cigarettes per day to about 10 cigarettes per day. Plaintiff had no anginal symptoms, and Dr. Apostol noted plaintiff was "stable at this time. He understands what he needs to do regarding his smoking as well as his cholesterol." He recommended that plaintiff return in six months.

Case 6:04-cv-03545-REL   Document 17   Filed 10/26/05   Page 13 of 50

On April 18, 2003, plaintiff had an MRI Angiography of the abdomen which was taken by Joan Tomanek, a radiologist with the Family Medical Care Center (Tr. at 232-233). Dr. Tomanek noted no renal artery stenosis, two left kidney simple cysts, and it was otherwise an unremarkable exam. Plaintiff also had an Echocardiogram performed by Raymond Rosario, a cardiologist (Tr. at 234-235). Dr. Rosario listed the following impression: "Left ventricle normal in size with global left ventricular function preserved. Estimated left ventricular ejection fraction approximately 60%[6]. No regional wall motion abnormality. Left atrial dilation (mild). Right ventricle normal in size. Right atrium normal in size. No structural valvular abnormality. Mild mitral regurgitation. No thrombus. No pericardial effusion." Plaintiff had an MRI scan of the lumbosacral spine performed by John Bartlett, a radiologist (Tr. at 237-237). Dr. Bartlett noted (1) a moderate focal disc protrusion to the right of midline present at L5-S1, needing clinical correlation; (2) moderate degenerative changes present at L4-5 and L3-4. The extradural discogenic posterior deformities were somewhat more broadly based, although at L4-5 they were centered slightly to the right of midline. Again clinical correlation was needed. Plaintiff also had an MRI of the cervical spine, also performed by Dr. Bartlett, who found no significant abnormality (Tr. at 238). That same day, Candi Griffin, R.N. discussed daily diabetes foot care with plaintiff (Tr. at 239-241).

---

[6]Normal is anything over 55%.

On May 2, 2003, plaintiff saw Dr. Krenn for a recheck of peripheral neuropathy (Tr. at 229-231). Plaintiff had had an MRI of the neck and back after his last visit with Dr. Krenn. Those showed mild degenerative changes. Plaintiff started physical therapy. "Lower extremity neuropathies stable, has regained some strength in lower extremity, able to move ankle. Still has difficulties moving toes. New complaint today is worsening numbness in right upper extremity. . . . Has normal movement and strength of bilateral upper extremity. Right thumb is numb as well. Other fingers not involved. Denies any paresthesias[7] above upper arm. No neck pain. . . . Normal speech. No change in hearing or vision." Plaintiff's blood sugar was controlled during the day but was getting somewhat high after fasting. "Is sticking to diabetic diet. Has not increased activity much though." Hypertension was well controlled. No other concerns today. "Patient denies pain relating to the reason for this office visit." He also denied any visual changes. His weight was 268 pounds. Dr. Krenn recommended plaintiff increase his exercise and continue physical therapy for his lumbar disc displacements.

On May 29, 2003, plaintiff saw Geoffrey Bricker, a podiatrist, at the request of Dr. Krenn (Tr. at 189). Plaintiff complained of a callous on the right hallux and numbness and tingling of his feet. "Examination reveals a keratoma

---

[7]Burning or prickling sensation which is usually painless and described as tingling or numbness, skin crawling, or itching.

[callous] medial to the hallux of the right foot, which is tender with palpation. . . . [A]nkle dorsiflexion is zero degrees. . . . Muscle strength is within normal limits. The diagnoses are: 1. Diabetic neuropathy[8] 2. Gastrosoleal equinus 3. Exostosis[9] of the right hallux 4. Onychomycosis[10]. Initial treatment consisted of Pletal[11] 100 mg BID [twice a day], and he was instructed in appropriate stretching exercises. . . . He was also advised in proper shoe selection and will be seen again in one month".

On June 6, 2003, plaintiff saw Dr. Krenn for a recheck (Tr. at 226-228). Plaintiff reported that his blood sugars had done really well, his hypertension was under good control as well. "Went to podiatrist, made several recommendations, changed shoes and feels feet doing better. Since changing shoes and starting PT [physical therapy], has regained movement in feet and ankles. Sensation in feet and right LE [lower extremity] has improved as well. Back pain is stable. No new concerns. Patient denies pain relating to the reason for this office visit." Plaintiff also denied visual changes. He was smoking 1/2 pack of cigarettes per

_____

[8]Diabetic neuropathy is a peripheral nerve disorder caused by diabetes. Numbness, pain, or tingling in the feet, or legs may, after several years, lead to weakness in the muscles of the feet.

[9]The abnormal formation of a bony growth.

[10]Fungal infection of the toenails.

[11]Pletal is used to reduce the symptoms of intermittent claudication (pain in the legs that happens when walking and goes away with rest). Pletal helps people walk a longer distance before leg pain occurs.

16

day and walking for exercise.  His weight was 273 pounds.  Dr. Krenn diagnosed hypertension, improved; hyperlipidemia, mixed, unchanged; diabetes, controlled; chronic renal insufficiency, unchanged; peripheral neuropathy, unchanged; and displacement, lumbar disc, L5-S1, L3-4, L4-5, unchanged.  He continued plaintiff's treatment for hypertension and diabetes, increased ACE due to renal disease, "patient tolerating med well."  Referred plaintiff back to physical therapy, "encouraged to keep appointments to avoid discharge in the future."

On July 9, 2003, plaintiff saw Nilesh Patel, M.D. (Tr. at 181-182).  "Patient comes in today.  He is actually feeling quite well.  Does report that he is having pain in his kidneys that doubles him over occasionally.  On evaluation his MRI did show some cysts but no renal artery stenosis [narrowing].  He does have renal insufficiency and this is likely related to both hypertension, small vessel nephrosclerosis[12] from smoking and he does have diabetes but I think it is unlikely that he has diabetic nephropathy[13] as his urinalysis is entirely benign."  Plan:  Follow up in one year, "keep blood pressure under good control as it is today at 130/64."

_____

[12]Kidney disease that is usually associated with hypertension; sclerosis of the renal arterioles reduces blood flow that can lead to kidney failure and heart failure.

[13]Kidney disease due to long-standing diabetes.

On July 25, 2003, plaintiff saw Dr. Krenn for a recheck (Tr. at 223-225). Plaintiff's NCV [nerve conduction velocity] tests confirmed polyneuropathy[14]. Plaintiff continued to have numbness, pain, and decreased strength in his lower extremities and somewhat in his upper extremities. He had been having some cramps in his legs and locking in his fingers. His diabetes "continues to be under good control" and his blood pressure "remains under good control as well." Plaintiff had no new concerns. His weight was 279.8. On exam, his strength was normal, he had decreased sensation on the anterior right foot, left foot, and anterior right upper extremity. Dr. Krenn diagnosed trigger finger; polyneuropathy in diabetes, unchanged; diabetes, controlled, unchanged; and hypertension, unchanged. He continued plaintiff's treatment for hypertension and diabetes, "both well controlled", referred to another doctor for treatment of trigger fingers, and started Neurontin for plaintiff's neuropathy.

On August 18, 2003, plaintiff saw Jason Bergman, M.D., at Family Medical Care Center, the same office as Dr. Krenn's (Tr. at 222-224). Plaintiff presented with a greater than one year history of painful locking and catching of his middle fingers. Plaintiff reported it had slowly progressed in severity. Plaintiff said he had decreased his smoking from five packs per day to 1/2 pack per day. On exam, plaintiff was found to have typical and sustained triggering and locking of the middle fingers and some decreased sensation. He had no peripheral

_____

[14]Loss of movement or sensation caused by inflammation of multiple nerves.

18

neuropathy in either upper or lower extremities related to his diabetes. Plaintiff

received an injection of Kenalog and Marcaine in his fingers.

On September 2, 2003, plaintiff saw Dr. Krenn for a follow up (Tr. at 219-

221). Plaintiff reported that his blood sugar was running between 90 and 100.

He denied that pain was the reason for his visit, and he denied visual changes.

His weight was 281 and his blood pressure was 120/70. Dr. Krenn diagnosed

polyneuropathy in diabetes, unchanged; diabetes, controlled; hyperlipidemia,

mixed, unchanged; and hypertension, unchanged. He continued plaintiff on his

current treatment plan, and he noted that plaintiff's hypertension and diabetes

were well controlled.

On November 14, 2003, plaintiff saw Dr. Krenn and complained of a

cough (Tr. at 216-218). He had no other concerns that day. He denied visual

changes, denied mental status changes. He weighed 292.6 pounds and his

blood pressure was 100/60. Dr. Krenn diagnosed sinusitis and noted that

plaintiff's diabetes was controlled.

On November 19, 2003, plaintiff saw Dr. Krenn for a recheck (Tr. at 213-

215). "Has new concern about mood swings, pretty much every day. States just

comes on out of the blue. Hasn't been under a lot of stress lately, is remodeling

his home, but states not really stressing him much. Does feel depressed, has

had problems with sleeping, eating, anhedonia[15], concentrating, and staying on

---

[15] The absence of pleasure or the ability to experience it.

task.  Has seen psychiatrist in past after release from prison at court's request.
Unsure what dx [diagnosis] was given.  Wasn't much help.  No other concerns.
Patient denies pain relating to the reason for this office visit."  Plaintiff weighed
290 pounds, his blood pressure was 114/66. Dr. Krenn started plaintiff on Paxil
for depression.

On January 2, 2004, plaintiff saw Dr. Krenn for a follow up on depression,
diabetes, hypertension, and lipids (Tr. at 210-218).  Plaintiff's blood pressure was
doing well, was continuing on medication for hypertriglyceridemia and was trying
to stick to his diet.  His depression had "improved greatly since starting Paxil.  No
longer has mood swings."  Plaintiff's weight was 292.6 pounds, his blood
pressure was 118/70.  Dr. Krenn diagnosed diabetes controlled; hyperlipidemia,
unchanged; and hypertension, unchanged.  He continued plaintiff's medication.

On January 6, 2004, plaintiff saw Vicki Park, a registered nurse in the
Ferrell-Duncan Clinic, who works with cardiologist Dr. Apostol (Tr. at 250-252).
Plaintiff was present for a six-month follow up.  His diagnoses included coronary
artery disease, hypertension, diabetes, hyperlipidemia, obesity, tobacco abuse,
and history of renal insufficiency. "He states that he does experience chest pain
with exertion such as carrying in loads of wood or groceries.  He states that the
nature, duration, and frequency of the chest pain is unchanged over the last two
years.  He also complains of dyspnea [shortness of breath], however, states he
has chronic obstructive pulmonary disease as well as sleep apnea.  Evidently the

sleep apnea was diagnosed by a doctor in Iowa.  He does not use any type of

assistive CPAP device[16] at night. . . .  [H]e continues to struggle with elevated

triglycerides.  Methods to assist with triglyceride lowering such as diet, weight

loss, and exercise were reviewed with Mr. Davis."  Plaintiff was continued on his

current medications.  "Mr. Davis has never had his sleep apnea evaluated,

therefore, he was set up for a sleep study."  Ms. Park recommended that plaintiff

follow up with Dr. Apostol in six months.

On January 16, 2004, plaintiff saw Dr. Krenn for flank pain and a possible

kidney stone (Tr. at 207-209).  Plaintiff reported that a few days ago he was

walking to his garage and had severe pain in the left side of his mid back.  He

went to the emergency room and was told he had blood in his urine but the ER

doctor felt the problem was more in plaintiff's back.  Plaintiff was given Percocet,

which he was taking only at night to help him sleep.  He had no other concerns.

His weight was 288.6 pounds, his blood pressure was 110/68.  Dr. Krenn

diagnosed minor Hematuria[17], minor left flank pain.  He refilled plaintiff's

Percocet.

---

[16]CPAP is continuous positive airway pressure.  A CPAP machine is a simple
respiratory ventilator used mainly by patients at home for the treatment of sleep
apnea. In sleep apnea, the patient's airway becomes restricted as his muscles
relax naturally during sleep, which causes arousal from sleep. The CPAP
machine stops this phenomenon by delivering a constant stream of compressed
air via a mask, which splints the airway, allowing the patient to breathe freely.
The CPAP machine blows air at one set pressure (called the titrated pressure),
usually programmed into the machine by the sleep physiologist.

[17]Presence of red blood cells in the urine.

21

On February 10, 2004, plaintiff saw Edward Gwin, M.D., a pulmonary specialist, at the request of Dr. Apostol, plaintiff's cardiologist who requested a sleep apnea evaluation (Tr. at 259-262). "It was Dr. Apostol's thought that perhaps he had already been diagnosed in Iowa, but he says he tried to bring this to his doctor's attention but they never would pay any attention to him because he was on Medicaid. . . . He does not drive because he is too worried about falling asleep while driving, and his wife does all the driving. . . . He was a smoker of 5 packs a day and now smokes less than one pack a day. . . . The patient can't breathe while on his back or laying flat and usually sits up in a chair to breathe and will often fall asleep in his chair, waking up in the morning, having slept there all night. . . . He has very erratic sleep times at present, sometimes not going to bed until 2-3 in the morning and then sleeping late in the morning. . . . As mentioned, he falls asleep a lot in his chair and even if he gets up early he will go back to sleep later. He drinks Diet Mt. Dew day and night." Dr. Gwin performed a physical exam. He recommended that plaintiff lose weight and have a routine polysomnogram [sleep study].

On March 3, 2004, plaintiff saw Jared Pehrson, M.D., in the Family Medical Care Center, the same office as Dr. Krenn (Tr. at 206). "Mr. Kipp Davis came in for an injection in his hand two months ago for what is described as trigger fingers. . . . He notes that the triggering has been relieved, he is no longer having any specific problems." On exam, plaintiff's hands demonstrated full

22

range of motion.  Dr. Pehrson assessed "triggering that has resolved with an injection."

On April 2, 2004, plaintiff saw Dr. Krenn for a recheck (Tr. at 202-204).  Plaintiff's hypertension was doing well, he had no problems with CP [chest pain], headache, or other concerns with blood pressure.  "Has not required but very rare use of Percocet for pain. . . .  Depression is stable, tolerating medication without concerns.  No other concern."  Plaintiff denied visual changes.  He weighed 294.6 and his blood pressure was 124/70.  He had normal range of motion in his back, his behavior and affect were appropriate.

Impression:  Obesity unchanged; depression unchanged; diabetes controlled unchanged; CAD [coronary artery disease] unchanged; hyperlipidemia, mixed, unchanged; hypertension unchanged.  Dr. Krenn continued plaintiff's current treatment for hypertension, found plaintiff's depression stable and continued his medication for that, and recommended he continue his diet and exercise for weight loss.

On April 5, 2004, plaintiff saw Dr. Krenn for lab work (Tr. at 199-201).  Plaintiff's total cholesterol was 225 (should be 200 or below), his HDL cholesterol was 27 (should be 40 or above), his triglycerides were 564 (should be below 150), and his blood sugar was 130 (should be between 70 and 100).

On April 6, 2004, Dr. Bricker completed a Residual Functional Capacity Assessment, the opinion discredited by the ALJ (Tr. at 191-193).  Dr. Bricker

23

found that plaintiff could frequently lift and/or carry less than ten pounds[18], occasionally lift and carry less than ten pounds, stand or walk for two hours total and for one hour at a time, sit for eight hours total and for two hours at a time, and had a limited ability to push or pull due to neuropathy.  He found that plaintiff could never climb, balance, stoop, kneel, crouch, or crawl, and that plaintiff was limited in his ability to reach, handle, finger, feel, see, speak, or hear.  He found that plaintiff had the following environmental restrictions:  heights, machinery, temperature extremes, dust, fumes, humidity, vibrations, and hazards, but when asked to describe, he wrote nothing.  When asked to describe in what way the impaired activities were limited, Dr. Bricker wrote nothing.  When asked whether plaintiff would need to take unscheduled breaks during an eight hour day, Dr. Bricker checked "yes" but did not state how often or for how long even though the form requested that information.  Dr. Bricker did not state whether plaintiff would be required to miss work each month as a result of his impairments or treatment. Finally, he checked "no" when asked whether his assessment included a consideration of pain, discomfort, or other subjective complaints.

On April 30, 2004, Dr. Krenn wrote a letter to whom it may concern (Tr. at 249).  The letter states in part as follows:

---

[18]Dr. Bricker originally checked "50 pounds" but then scratched that out and wrote "error".

24

It is my understanding that Mr. Davis is seeking disability based upon his medical conditions. The following is a summary of Mr. Davis's medical problems based upon my experience with Mr. Davis. . . .

Mr. Davis has several problems that may prevent him from maintaining gainful employment. Based on my visits with Mr. Davis, the most concerning of these being his neuropathy. This has left Mr. Davis with problems with sensation and resultant pain in his extremities. He has also lost strength at times and had difficulty moving his extremities related to this. The diagnosis of polyneuropathy has been confirmed by nerve conduction studies. The pain, sensation deficits, and limited function may limit his ability to work.

Mr. Davis's activity has also been limited by back pain. He has MRI documented disc displacement. He has been treated with physical therapy for this, but does have some residual pain.

Mr. Davis also suffers from depression, largely due to his chronic medical conditions that have limited his functionality. He is being treated currently with an anti-depressant.

Finally Mr. Davis has diabetes which requires frequent monitoring and insulin dosing. This condition itself would not prohibit Mr. Davis from obtaining employment, but he would need special consideration in regards to checking his blood glucose and meals/snacks.

Therefore, it is my opinion that Mr. Davis's ability to work could be limited by his polyneuropathy and its associated complications, and depression. Given his course to this point, his conditions should be considered life-long ailments.

On May 5, 2004, the administrative hearing was held. The following

records were submitted after the hearing:

On May 14, 2004, Dr. Bricker, plaintiff's podiatrist, completed

interrogatories that had been sent by plaintiff's counsel (Tr. at 256-257). The

form reads as follows:

25

1.     You indicate claimant is limited in his ability to reach, handle, finger, feel, see, and speak.  Please state the following with respect to this determination:

A.     All clinical signs supporting your conclusion:

*insensate to log filament in feet, diminished pulses*

B.     All findings you have made supporting your conclusion:

*See A*

C.     All test results performed to support your conclusion:

*See A*

D.     Any other basis for your conclusion:

*Diabetic Neuropathy*

(Tr. at 256-257).

On July 13, 2004, plaintiff saw Dr. Apostol, his cardiologist, for a follow up of his coronary artery disease, hypertension, and hyperlipidemia  (Tr. at 276-278).  "He states that he has been having chest pain and has been taking one bottle of Nitroglycerin tablets each month.  He describes the pain as being mid upper gastric in nature and intensity of 7-8/10 occurring at rest and with exertion. He states he has been using his CPAP machine and his sleep apnea [has]

Case 6:04-cv-03545-REL   Document 17   Filed 10/26/05   Page 26 of 50

improved.  He denies any difficulty sleeping."  Plaintiff denied weakness, muscle

cramping, joint pain, or peripheral edema[19].  He was observed to be sitting

comfortably in no acute distress.  Dr. Apostol recommended a left heart

catheterization.

On July 26, 2004, the ALJ found plaintiff not disabled.

On August 8, 2004, Dr. Apostol completed a Residual Functional Capacity

Assessment (Tr. at 284-286).  He found that plaintiff could frequently lift and/or

carry five pounds, occasionally lift and carry ten pounds, stand or walk for less

than one hour total and for 30 minutes at a time, sit for four hours total and for 30

minutes at a time, and had a limited ability to push or pull.  He found that plaintiff

could never climb, balance, stoop, kneel, crouch, or crawl, and that plaintiff was

limited in his ability to reach, handle, finger, feel, see, speak, or hear.  He found

that plaintiff had the following environmental restrictions:  heights, machinery,

temperature extremes, dust, fumes, humidity, vibrations, and hazards, but when

asked to describe, he wrote, "All of above".  When asked to describe in what way

the impaired activities were limited, Dr. Apostol wrote, "Chest pain at rest or with

minimal exertion".  When asked to describe the clinical and laboratory findings

and symptoms or allegations from which the impairment-related capacities and

limitations were concluded, Dr. Apostol wrote, "history and physical".  When

asked whether plaintiff would need to take unscheduled breaks during an eight

_____

[19]Abnormal build-up of fluids in ankle and leg tissues.

27

hour day, Dr. Apostol checked "yes" and wrote that the break would need to be 15 to 20 minutes long and would be every one to two hours. Dr. Apostol checked "yes" when asked whether plaintiff would be required to miss work each month as a result of his impairments or treatment, and noted he would miss about one day per month. Finally, he checked "yes" when asked whether his assessment included a consideration of pain, discomfort, or other subjective complaints.

On October 23, 2004, the Appeals Council denied plaintiff's request for review.

## C. *SUMMARY OF TESTIMONY*

During the May 5, 2004, hearing, plaintiff testified; and Michael Lala, a vocational expert, testified at the request of the ALJ.

## 1. Plaintiff's testimony.

Plaintiff testified that at the time of the hearing, he was 47 years of age (Tr. at 35). Plaintiff was six feet tall and weighed 292 pounds (Tr. at 35). Plaintiff is supposed to have no more than 75 grams of carbohydrate per meal and have as little fat as possible in his diet (Tr. at 36).

Plaintiff lives with his wife, who works at a restaurant (Tr. at 36). He and his wife bought a one-bedroom house less than a year before the hearing (Tr. at 57). His wife and neighbors did the moving (Tr. at 57). Plaintiff went to school through the 9th grade and has a G.E.D. (Tr. at 36). Plaintiff worked at a Waffle House Restaurant for about a month and a half more than a year before the

hearing (Tr. at 37). Plaintiff was let go from that job[20] because he was either at the hospital or unable to go to work or could not stand long enough or had to stop and take shots (Tr. at 37-38). Prior to that he worked as a truck driver (Tr. at 37, 38). Plaintiff left that job because he got sick with pancreatitis, neuropathy, and diabetes (Tr. at 38). It started when his right foot stopped working and he could not feel his toes (Tr. at 39). Plaintiff cannot carry a syringe or insulin on a truck, so he cannot get a D.O.T. license and therefore it would be illegal for him to drive a truck (Tr. at 39).

Plaintiff has an irregular heart rhythm and he has stents (Tr. at 39). He also has angina, and he takes nitroglycerin frequently (Tr. at 39). Dr. Apostle treats plaintiff's heart condition, and plaintiff has seen Dr. Apostle three times (Tr. at 40). Plaintiff's heart condition is controlled on medication (Tr. at 47).

Plaintiff has diabetes, and his medication has been changed so his diabetes is not totally controlled with medication (Tr. at 40, 47). Plaintiff has neuropathy, and his right foot has no feeling and he cannot move his toes at all (Tr. at 40). The toes do not work on his left foot, and his feeling in that foot is limited (Tr. at 40). His right leg is numb from his foot to the back of his knee (Tr. at 40). Plaintiff has special shoes he has to wear all day (Tr. at 45). He actually

---

[20]In a questionnaire plaintiff completed at the request of Disability Determinations, he specifically stated that he was not asked to quit that job (Tr. at 145). He wrote that he quit because he was sick too much and could not do all of his work as a cook (Tr. at 145).

changes his shoes four or five times a day because it makes his feet feel better (Tr. at 45). Plaintiff sometimes kicks his shoes off and sits with his feet elevated (Tr. at 51). He does this up to eight times per day for 15 to 25 minutes at a time (Tr. at 51). He does this because of muscle spasms in his feet, and elevating them helps them "calm down." (Tr. at 51).

The neuropathy affects plaintiff's vision, and he has had is bifocals changed 16 times in the past 18 months (Tr. at 41). His vision varies from day to day -- sometimes he cannot see up close, sometimes he cannot see far away (Tr. at 41).

Plaintiff also suffers from chronic renal insufficiency (Tr. at 42). After he left his job as a truck driver, plaintiff began experiencing depression, although he has not seen a psychologist or a psychiatrist (Tr. at 42).

Plaintiff has high blood pressure which is controlled with medication (Tr. at 42). He has sleep apnea for which plaintiff uses a CPAP machine (Tr. at 42). Plaintiff sleeps better with the CPAP (Tr. at 42).

Plaintiff has constant back pain, and his doctors have told him it is due to a bulging disc (Tr. at 43). He has degenerative disc disease, spondylosis, and a couple of other things (Tr. at 43). Because of his diabetes, surgery is not feasible (Tr. at 43). Plaintiff hurt his back in 1999 or 2000 and he continued to work after he hurt his back (Tr. at 48). If he did not have his other problems, his back would not keep him from working (Tr. at 48). He described his back pain as a six out of

30

ten (Tr. at 48).  Every few months, though, he winds up in the hospital on painkillers and muscle relaxers (Tr. at 48).  Plaintiff does not take any medication on a regular basis for his pain because his doctors said they are not safe to take on a regular basis due to his other health problems (Tr. at 49).

Plaintiff had a stroke in 1997, but does not have any residual side effects from that (Tr. at 43).

Plaintiff had problems with his fingers locking up; but he had a steroid injection in his knuckles in March (Tr. at 44).  He has problems with his thumb and index finger on his left hand getting numb and the tips of his fingers on his right hand get numb (Tr. at 50).  Plaintiff frequently drops things like coffee cups and soda cans (Tr. at 50).  Plaintiff can dress himself usually, but his wife helps him with buttons (Tr. at 50).  Plaintiff cannot grip to open a jar (Tr. at 51). Sometimes his wife has to shave him because he cannot "keep a razor working" (Tr. at 52).

Plaintiff can sit for 15 to 20 minutes before he has to get up and walk around (Tr. at 52).  He can walk without difficulty as long as he does not have to walk very far and he is on an even surface (Tr. at 52).  He cannot climb up stairs because of his chronic obstructive pulmonary disease -- it causes him to be out of breath (Tr. at 52-53).  In addition, his legs and feet are so bad that going up stairs is too hard (Tr. at 53).   Plaintiff can stand for about ten minutes (Tr. at 53). Plaintiff cannot do dishes because he cannot stand at the sink, his dexterity is not

Case 6:04-cv-03545-REL   Document 17   Filed 10/26/05   Page 31 of 50

very good, and with diabetes he does not want to cut himself on a knife (Tr. at 53). Plaintiff goes to the grocery store about once a month (Tr. at 54). He walks around while his wife shops (Tr. at 54). He runs out of breath if she walks too fast, otherwise he walks with her up and down the aisles (Tr. at 54). Plaintiff estimates he can lift five to ten pounds (Tr. at 54). Plaintiff does not drive because he cannot feel the pedals with his feet (Tr. at 55).

Plaintiff used to go fishing and do wood working, but he cannot do those things anymore (Tr. at 56). He mowed the yard for about 15 minutes the week before the hearing with a self-propelled push mower (Tr. at 58). He had to sit with his feet up after that (Tr. at 60). He felt bad because he has a large yard and his wife has to mow it (Tr. at 60). It usually takes her four hours to mow the front and back (Tr. at 60).

## 2. Vocational expert testimony.

Vocational expert Michael Lala testified at the request of the Administrative Law Judge.

The first hypothetical consisted of the limitations described in the Residual Functional Capacity Assessment of Dr. Geoffrey Bricker, plaintiff's podiatrist (Tr. at 64). The ALJ testified that a person with those limitations would not be able to perform any work (Tr. at 64).

The second hypothetical assumed the limitations in the first hypothetical except the person was not limited in dexterity, could reach, only needed normal breaks, and could lift ten pounds occasionally (Tr. at 65). The vocational expert testified that such a person could perform some sedentary, unskilled work (Tr. at 65-66). The person could not perform the full range of sedentary work due to the environmental restrictions (Tr. at 66). The person could be an information clerk, 237.367-046, with 1,600 in the state and 113,000 in the country (Tr. at 66). The person could also be a food and beverage order clerk, 209.567-014, with 2,500 jobs in the state and 184,000 jobs in the country (Tr. at 66).

If the person had a weak grip, he could still perform the above jobs (Tr. at 66). If the person could not reach overhead, he could still perform the above jobs (Tr. at 67).

If the person had to take an unscheduled break for 30 minutes, the person could do not work (Tr. at 67). If the person had to elevate his feet above waist level several times a day for 15 minutes at a time, he could perform no work (Tr. at 67).

## V.   FINDINGS OF THE ALJ

Administrative Law Judge David Fromme issued his opinion on July 26, 2004 (Tr. at 17-25). The ALJ found that plaintiff's past relevant work consists of a tractor trailer driver, a porter, and a commercial cleaner (Tr. at 17).

Step one.  The ALJ found that plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 18).

Step two.  The ALJ found that plaintiff suffers from diabetes mellitus with peripheral neuropathy, degenerative disc disease of the lumbar spine, chronic obstructive pulmonary disease, renal insufficiency, depression, hypertension, coronary artery disease, and obesity, which are severe impairments (Tr. at 18).

Step three.  The ALJ found that plaintiff's impairments do not meet or equal a listed impairment (Tr. at 18).

Step four.  The ALJ analyzed plaintiff's subjective complaints and found them to be exaggerated (Tr. at 19-22).  He then found that plaintiff has the residual functional capacity to perform sedentary, unskilled work (Tr. at 22).  Specifically, he found that plaintiff can stand and walk for two hours daily and for one hour at a time; sit for eight hours daily and for two hours at a time; lift ten pounds; he is limited in his ability to use foot controls; he should not kneel, crouch, climb, balance, work at heights, or work around hazardous unprotected moving equipment; and he should avoid extreme temperatures, moisture, dust, fumes, and vibrations (Tr. at 22).  The ALJ then found that with this residual functional capacity, plaintiff could not return to his past relevant work (Tr. at 23).

Step five.  The ALJ found that plaintiff can adjust to other work in the economy, such as working as an information clerk, with 113,000 jobs in the nation, or a food and beverage order clerk, with 184,000 jobs in the nation (Tr. at

34

23).  Therefore, plaintiff was found not disabled at the fifth step of the sequential analysis.

## VI.   CREDIBILITY OF PLAINTIFF

Although plaintiff did not specifically argue that the ALJ erroneously found plaintiff not credible, plaintiff did challenge the ALJ's discrediting the residual functional capacity assessment of plaintiff's treating podiatrist, Dr. Bricker.  Dr. Bricker's opinion appears to be based largely on plaintiff's subjectively complaints.  Therefore, I will briefly discuss the credibility issue.

## A.   CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988);  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions.  Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

35

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> [T]he claimant's subjective complaints are found to be exaggerated and inconsistent with the other evidence, including the clinical and objective findings of record and are not a sound basis for decision-making.
>
> . . . The claimant was also treated conservatively for hypertension, which has generally improved. The claimant was also treated for diabetes which is largely controlled with insulin.
>
> The claimant has been treated for diabetes and has complained of peripheral neuropathy and complains of feet numbness. In September 2003 and later, the claimant's neuropathy was noted to be improved. At times, physical exam of the right foot revealed an inability to move his toes. There have also been incidents of decreased range of motion of the right ankle and decreased pressure sensation in the left foot. Limitations such as this would likely limit the claimant from performing work that would

36

require significant amounts of standing or walking, but does not seem to necessarily preclude all standing and walking in all work activities.

The claimant's medical history includes that of a stent placement in 1999, which has been fairly effective without serious long term adverse residuals. An echocardiogram was negative in April 2003. Pulmonary function tests revealed an ejection fraction of 60% which was consistent with mild atrial dilation and a mild mitral leak. Examination in April 2004 revealed a normal heart. The evidence suggests that the claimant ought to avoid highly exertional work, but not necessarily all work whatsoever.

. . . MRI of the cervical spine revealed only "mild" degenerative disc disease. An MRI of the lumbar spine revealed only "moderate" degenerative disc disease. Radiology studies such as this [are] consistent with limitations from performing heavy lifting and exertional activities, but "mild" and moderate limits would seemingly allow for the performance of lesser exertional activities. Claimant does not consider his back condition disabling, according to his testimony.

. . . The claimant exhibits bilateral middle finger trigger phenomenon. However, this syndrome appears to have lasted for only a few months and 'resolved with an injection." . . . In May 2003, the claimant had an essentially negative physical exam. He had increased range of motion in the hands and shoulders and the strength of his upper extremity has increased. While the claimant continues to complain of occasional hand pain, it does not seem to limit the claimant for more than a minimal amount for any extended period.

. . . [E]ven while [renal insufficiency] produced a single hospitalization in October 2002, the record does not document that this impairment persisted or that it would add limitations to his functional capacity.

The claimant has also been treated for depression, but has never been hospitalized or sought treatment from a mental health specialist. Although he has complained of mood swings, progress notes indicated that he has improved on Paxil. . . .

. . . Although he claims to be homebound, he previously reported that he helps around the house with folding laundry and putting the dishes up. He makes model cars and boats, reads, and visits with friends for coffee. There is also indication that as of November 2003, he was remodeling his home. . . .

The claimant's history also includes hernia repairs, which [have] not caused significant complications. He has also been diagnosed with sleep apnea, which is controlled with the use of a CPAP machine. The claimant has weight measured as high as 280 pounds and has been diagnosed with morbid obesity. In January 2004, examining physicians have concluded that the claimant's condition was "stable."

. . . [C]laimant has a somewhat sporadic work history with periods of little or no substantial earnings even before the alleged onset of disability. The claimant's work record draws into question the claimant's motivation to work and his credibility in assigning reasons for not working.

. . . He does not complain of adverse effects of any of his medication.

(Tr. at 19-22).

I find that the record supports the ALJ's finding that plaintiff's complaints are exaggerated. The ALJ correctly noted that plaintiff has long periods of unemployment and relatively low earnings during his lifetime, suggesting that his lack of employment now may not be due to his impairments.

Plaintiff reported in a claimant questionnaire that his wife does all the driving because he cannot feel the pedals with his feet and he is on a lot of medication which makes it unsafe to drive. He told Dr. Gwin that plaintiff's wife does the driving because plaintiff is afraid he will fall asleep while driving.

In November 2003, plaintiff was remodeling his home. In January 2004, he talked about how he feels after he carries in loads of wood or groceries. Plaintiff is able to put dishes away which indicates some ability to lift and reach.

Plaintiff testified that he had his bifocals changed 16 times in the past 18 months; however, the only mention of vision problems in the record was on

38

October 29, 2002, when plaintiff told his doctor that he had had his glasses subscription updated on more than one occasion over the past several months due to blurred vision.   When he saw Dr. Lin on February 26, 2003, plaintiff denied blurred vision.  On March 28, 2003, plaintiff denied visual changes.  On June 6, 2003, plaintiff denied visual changes.

Plaintiff testified that he sits with his feet elevated due to spasms, and elevating his feet helps them "calm down."  However, plaintiff never complained of foot spasms, and not even his podiatrist told him to elevate his feet during the day.

Plaintiff testified that his diabetes was not controlled; however, nearly all of the medical records indicate that plaintiff's diabetes was well controlled.

Plaintiff testified that he winds up in the hospital every few months due to back pain; however, the records do not indicate that plaintiff was hospitalized for anything other than renal insufficiency on one occasion.

Plaintiff told Dr. Krenn that nitroglycerin relieves any chest pain.  Plaintiff was only occasionally taking Percocet for pain.  He never complained of any side effects of his medication.

When being examined by Dr. Lin in February 2003, plaintiff claimed he could not tell when the doctor moved plaintiff's toes up or down.  When the doctor stated that such a claim created a discrepancy, plaintiff said to try again and he then could tell with no difficulty.

Plaintiff testified that he was fired from Waffle House because he was at the hospital or unable to go to work or could not stand long enough to do his job. However, in his questionnaire, he specifically stated that he was not asked to leave that job, that he left on his own because he was sick too much or could not do all of his work as a cook.

Finally, I note that there is a seven-month gap with no medical records during the first year after plaintiff's alleged onset of disability.

## VII.   OPINION OF DR. BRICKER

Plaintiff first argues that the ALJ erroneously discredited the opinion of Dr. Bricker, plaintiff's treating podiatrist.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques.  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).  If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating physician:  (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the

opinion with the record as a whole, and (6) specialization of the doctor. 20

C.F.R. § 404.1527(d)(2) - (5).

Dr. Bricker, a podiatrist, found that plaintiff could frequently lift and/or carry

less than ten pounds, occasionally lift and carry less than ten pounds, stand or

walk for two hours total and for one hour at a time, sit for eight hours total and for

two hours at a time, and had a limited ability to push or pull due to neuropathy.

He found that plaintiff could never climb, balance, stoop, kneel, crouch, or crawl,

and that plaintiff was limited in his ability to reach, handle, finger, feel, see,

speak, or hear. He found that plaintiff had the following environmental

restrictions: heights, machinery, temperature extremes, dust, fumes, humidity,

vibrations, and hazards, but when asked to describe, he wrote nothing. When

asked to describe in what way the impaired activities were limited, Dr. Bricker

wrote nothing. In the interrogatories sent to Dr. Bricker after the hearing, he

provided no further insight into his opinion of plaintiff's restrictions.

During the administrative hearing, the vocational expert testified that a

person with the restrictions listed by Dr. Bricker – except that the person was not

limited in dexterity, could reach, only needed normal breaks, and could lift ten

pounds occasionally – would still be able to work. The ALJ adopted that

testimony. Therefore, these few abilities are the only relevant ones.

In a claimant questionnaire, plaintiff reported that he puts together model

cars and boats. His only reported difficulty was with concentrating, not with

41

manual dexterity. Plaintiff testified that he is able to put dishes away, indicating that he can lift and reach. He reported to his doctor that he carried loads of wood and groceries, and he was remodeling his house, and he testified that he used a push mower for about 15 minutes the week before the hearing, indicating that he is capable of occasionally lifting at least ten pounds. On March 28, 2003, plaintiff reported that he was walking for exercise. On June 6, 2003, he reported that he was walking for exercise. He also reported that walking helped his back and leg feel better.

Dr. Bricker's residual functional capacity assessment provides no support for his opinion. For example, when asked whether plaintiff would need to take unscheduled breaks during an eight hour day, Dr. Bricker checked "yes" but did not state how often or for how long even though the form requested that information.

In addition to the lack of support for his findings and plaintiff's obvious abilities beyond those found by Dr. Bricker, the remainder of the record conflicts with Dr. Bricker's findings. Dr. Bricker found that plaintiff was limited in his ability to see, hear, and speak. However, the record with regard to plaintiff's vision has been discussed above and is limited to his complaint on one occasion that he had blurred vision and had gotten his glasses adjusted. Multiple times after that, plaintiff denied any vision problems. Mayela Hilton of Disability Determinations observed that plaintiff had no difficulty hearing, seeing, or talking. Plaintiff never

Case 6:04-cv-03545-REL   Document 17   Filed 10/26/05   Page 42 of 50

alleged difficulty speaking or hearing, in fact he specifically denied any problems

with speech on February 2003 when he saw Dr. Lin.  On May 2, 2003, Dr. Krenn

noted that plaintiff had normal speech, and there was no change in plaintiff's

hearing or vision.  On June 6, 2003, plaintiff denied any vision problems.  On

September 2, 2003, plaintiff denied any vision problems.  On November 14,

2003, plaintiff denied any visual problems.  On April 2, 2004, plaintiff denied any

visual problems.

It is unusual indeed for a podiatrist to make a finding regarding his

patient's ability to hear, speak, or see, all areas clearly outside a podiatrist's area

of specialty.  It is even more unusual in this case since I can find only one record

of a visit to Dr. Bricker, and that was on May 29, 2003.  Dr. Bricker completed the

RFC assessment on April 6 , 2004, nearly a year after that one appointment, and

he completed the interrogatories on May 14, 2004, with no other visits or

treatment during that time.

Finally, the findings of Dr. Bricker conflict not only with plaintiff's testimony

and his demonstrated abilities, but also with the other medical evidence.  Dr. Lin

found that plaintiff had no impairment of sitting, standing, walking, hearing,

speaking, or traveling, and that plaintiff is able to do lifting, carrying, and handling

objects.  No doctor has ever restricted plaintiff's sitting, standing, walking, lifting,

carrying, or handling.

The length of plaintiff's treatment relationship with Dr. Bricker; the fact that there was only one examination; the fact that the examination was of plaintiff's feet, not his entire body; the fact that Dr. Bricker offered no medical or laboratory support for his findings; the fact that his opinion is inconsistent with the record as a whole; and the fact that Dr. Bricker is a podiatrist, and his findings appear to be outside his area of expertise, all support the ALJ's decision to discredit Dr. Bricker's opinion.  See 20 C.F.R. § 404.1527(d)(2) - (5).

## VIII.   CONSIDERATION OF PLAINTIFF'S OBESITY

Plaintiff argues that the ALJ erroneously failed to consider the cumulative effect obesity may have on plaintiff's other body symptoms, "to wit plaintiff's polyneuropathy, depression, chronic obstructive pulmonary disease, coronary artery disease, renal insufficiency, etc."

First, I note that there are no allegations anywhere in the medical records or even in plaintiff's own testimony that he suffers from functional limitations due to his obesity.  Second, the record is clear that plaintiff's "other body symptoms" listed in his motion do not combine with his obesity to cause functional restrictions.

Polyneuropathy.  Polyneuropathy is loss of movement or sensation. Plaintiff's medical records show that he experienced multiple problems over the years with loss of sensation in his feet and loss of movement in his toes and ankle.  As a result, the ALJ found that plaintiff was limited in his ability to stand or

44

walk, and the ALJ's residual functional capacity assessment states that plaintiff is limited to two hours total of walking or standing per work day and that he may stand or walk for only one hour at a time. This is the same restriction as that found by Dr. Bricker, plaintiff's treating podiatrist and whose opinion plaintiff urged the ALJ to accept.

Depression. The record establishes that on November 19, 2003, plaintiff complained of symptoms of depression. He was given a prescription for Paxil. By January 2, 2004, his depression had "improved greatly" on the Paxil. On April 2, 2004, his depression was stable, he was tolerating his medication with no concerns. There is no further mention of depression in the record.

Chronic Obstructive Pulmonary Disease. Plaintiff's doctor noted on March 28, 2003, that plaintiff's chronic obstructive pulmonary disease was stable. There are no complications or any other restrictions mentioned in the record regarding this impairment. There are, however, numerous references to plaintiff's long and significant history of smoking, his continued smoking, and his doctor's recommendations that he stop smoking. Failure to follow a prescribed course of treatment, without good reason, is grounds for denial of disability benefits, as well as a basis for discrediting the subjective complaints of pain. 20 C.F.R. § 404.1530(b); Clark v. Shalala, 28 F.3d 828, 831 & n.4 (8th Cir. 1994); Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993).

Coronary Artery Disease.  The records state on March 28, 2003, that plaintiff has coronary artery disease but no associated symptoms; on April 3, 2003, that he has coronary artery disease; on January 6, 2004, that he has coronary artery disease; on April 2, 2004, that he has coronary artery disease, unchanged; and that on July 13, 2004, he has coronary artery disease.  There are no complications listed, and there are no functional restrictions associated with coronary artery disease.  In fact, plaintiff testified at the administrative hearing that his heart condition is controlled with medication.

Renal Insufficiency.  Plaintiff was hospitalized on October 29, 2002, and was diagnosed with renal insufficiency.  A renal ultrasound showed a simple cyst on his left kidney, but no other problems.  On March 28, 2003, plaintiff's renal insufficiency was noted to be unchanged.  On April 3, 2003, Dr. Patel noted plaintiff has renal insufficiency.  On April 18, 2003, a MRI Angiography showed no renal artery stenosis.  Plaintiff had two simple cysts, but otherwise the MRI Angiography was unremarkable.  On June 6, 2003, plaintiff's renal insufficiency was unchanged.  On July 9, 2003, plaintiff again saw Dr. Patel who noted plaintiff has renal insufficiency and recommended plaintiff follow up in one year.  There are no records indicating that plaintiff suffers from any restrictions due to his renal insufficiency, either alone or in combination with obesity or anything else.

I mention here also that the medical records establish that plaintiff was told repeatedly by his doctors to increase his exercise, indicating that plaintiff's

doctors believed he was capable of and would benefit from exercise. On May 2, 2003, Dr. Krenn recommended that plaintiff increase his exercise. On January 6, 2004, while at Dr. Apostol's office, plaintiff was reminded to exercise. On April 2, 2004, Dr. Krenn recommended that plaintiff exercise and try to lose weight.

I find that the ALJ adequately considered plaintiff's obesity in combination with plaintiff's other impairments and, based on the record, arrived at physical restrictions which incorporate all of plaintiff's impairments, including obesity.

## IX.    CONSIDERATION OF PLAINTIFF'S PAIN

Plaintiff next argues that the ALJ did not properly consider plaintiff's pain.

The ALJ did not deny that plaintiff experiences pain. To the contrary, the ALJ included major limitations in plaintiff's residual functional capacity to account for the pain that his impairments could cause. As discussed above, however, the ALJ did not find plaintiff's subjective complaints of pain to be completely credible, and that finding is supported by the record.

On March 28, 2003, plaintiff told Dr. Krenn that nitroglycerin relieves his occasional chest pain. On April 3, 2003, plaintiff said he was experiencing no chest pain. On May 2, 2003, plaintiff denied that pain was the reason for his visit to Dr. Krenn. On June 6, 2003, plaintiff reported that his back pain was stable. He also denied that he was at the doctor's office due to pain. On September 2, 2003, plaintiff indicating that he was not having a problem with pain. On November 19, 2003, plaintiff denied pain. On April 2, 2004, plaintiff stated that

47

he had not required "but very rare use of Percocet for pain."  Plaintiff testified that absent his "other problems," his back pain would not keep him from working.

Based on the medical records discussed above and the ALJ's credibility finding, which is supported by the record, I find that the ALJ properly accounted for plaintiff's pain in determining that he could perform some work.

## X.    NEW EVIDENCE

Finally, plaintiff argues that this case should be remanded so the ALJ can consider the Residual Functional Capacity Assessment of Dr. Apostol, plaintiff's cardiologist.

Plaintiff states that the Appeals Council did not analyze this evidence. However, the Appeals Council's notice to plaintiff indicates that the new evidence, including the evaluation by Dr. Apostol, was considered (Tr. at 9). Although the Appeals Council did not outline the specific reasons for its determination, there is no requirement that it articulate its reasons for denying review.  20 C.F.R. § 404.970(b); Ridings v. Apfel, 76 F. Supp. 2d 707, 709 (W.D. Va. 1999) (Appeals Council is not required to give detailed assessment of its failure to grant review after it has considered new evidence).

In addition, it is unlikely that Dr. Apostol's RFC Assessment would have resulted in the ALJ finding plaintiff disabled.  Like Dr. Bricker, Dr. Apostol found that plaintiff is limited in his ability to handle, finger, feel, see, speak, or hear. And like the analysis above regarding Dr. Bricker's opinion, the evidence in the

48

record clearly contradicts such findings. Dr. Apostol found that plaintiff could sit for a total of four hours all day and for only 30 minutes at a time. However, the records show that during the two visits during which Dr. Apostol saw plaintiff (April 8, 2003, and July 13, 2004), the only mention of sitting was on July 13, 2004, when Dr. Apostol noted that plaintiff was sitting comfortably. There is no allegation by plaintiff that he has difficulty sitting, no observation by Dr. Apostol that plaintiff has trouble sitting, and no findings or restrictions on plaintiff's ability to sit. Dr. Apostol found in his RFC assessment that plaintiff could stand or walk for less than one hour total and for 30 minutes at a time. Again, nowhere in the records of those two visits does Dr. Apostol mention standing or walking, and nowhere in those records does plaintiff allege any difficulty with standing or walking.

In support of his findings, Dr. Apostol wrote, "chest pain at rest or with minimal exertion." The records reflect that plaintiff alleged he experienced chest pain at rest or with minimal exertion. There are no tests done, there are no clinical findings, there is nothing to support such a finding other than plaintiff's subjective complaints which have previously been found not credible.

Based on all of the above, I find that the ALJ's decision is supported by substantial evidence, and remand for explicit consideration of Dr. Apostol's opinion is unwarranted.

Case 6:04-cv-03545-REL   Document 17   Filed 10/26/05   Page 49 of 50

## XI.    CONCLUSIONS

Based on all of the above, I find that the ALJ's finding that plaintiff can perform other work in the economy is supported by substantial evidence. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


 */s/ Robert E. Larsen*
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
October 25, 2005

Case 6:04-cv-03545-REL   Document 17   Filed 10/26/05   Page 50 of 50